2024 IL App (2d) 230252-U
No. 2-23-0252
Order filed June 25, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 12-CF-1684 |
| | ) | |
| JOSE MENDOZA-SOSA, | ) | Honorable |
| | ) | C. Thomas Hull III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's postconviction ineffectiveness claim was properly dismissed where he failed to show a reasonable probability that appellate counsel would have succeeded in challenging the trial court's admission of uncharged sex offenses against the child victim and her younger sister, to show defendant's propensity to commit the charged sex offenses against the victim.

¶ 2    Defendant, Jose Mendoza-Sosa, appeals from an order granting the State's motion to dismiss his amended petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) for relief from his conviction of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b)(West 2012)) and multiple counts of criminal sexual assault (*id.* § 11-1.20(a)(1), (3)).

In his amended petition, defendant claimed that he received ineffective assistance from counsel on direct appeal. Defendant claimed counsel should have argued that the trial court erred in admitting evidence of defendant's uncharged sex offenses. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4     Following a jury trial in the circuit court of Kane County, defendant was convicted of 20 counts of criminal sexual assault and a single count of aggravated criminal sexual abuse. The victim of the offenses—which took place between June and August 2012—was one of defendant's daughters, F.M., who was 15 years old during that period.

¶ 5     Before trial, the State filed a motion *in limine* to admit evidence under section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2012)) of uncharged sex offenses committed by defendant. The State sought to admit evidence that defendant committed sex offenses against F.M. in Mexico, in Indiana, and at a motel in Du Page County. The uncharged offense in Mexico allegedly occurred when F.M. was seven years old. The offense in Indiana allegedly occurred when F.M. was 11 or 12. The uncharged offense that allegedly occurred in Du Page County was contemporaneous with the charged offenses. The State also sought to admit evidence that defendant committed sex offenses against another daughter, L.M., in Indiana in 2010, and at the same Du Page County motel in 2012.

¶ 6     Reasoning that the probative value of the alleged offense in Mexico when F.M. was seven was outweighed by the danger of undue prejudice, the trial court excluded evidence of that offense. However, the trial court ruled that the other uncharged offenses were admissible. The trial court also ruled that the jury would receive the following limiting instruction whenever evidence of uncharged offenses was introduced:

"Evidence has been received that the defendant has been involved in offenses and conduct other than those charged in the indictment. This evidence has been received on the issue of the defendant's propensity to commit the offense charged in the indictment. It may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in those offenses and conduct; and, if so, what weight should be given to the evidence on the issue of the defendant's propensity to commit the offense charged in the indictment."

¶ 7 The case proceeded to trial on 27 counts of criminal sexual assault and 3 counts of aggravated criminal sexual abuse. At trial, the State presented evidence that, after his arrest, defendant was interviewed in jail by two investigators from the Du Page County State's Attorney's office, Rachel Reiger and Carmen Easton. The interview was conducted in Spanish. A transcript of the interview translated into English was admitted into evidence. During the interview, defendant indicated that he was born on February 26, 1968. Asked why he was in jail, defendant responded, "Because my daughter accused me of raping her." Defendant clarified that his daughter, F.M., "said [he] raped her, during different occasions." Asked what he thought about that, defendant replied, "What do I think?—that it is true." Defendant also denied raping L.M.

¶ 8 F.M. testified that she was born on October 17, 1996. Between June and August of 2012, she lived in Aurora with her mother, defendant, L.M., and her Uncle Carlos. While the family lived in Aurora, F.M.'s mother worked from 11 p.m. to 7 a.m. Before F.M. lived in Aurora, she lived in Indiana for about eight years. When she was 12, her mother traveled out of Indiana to attend a funeral. F.M. remained at home with defendant. Defendant kept F.M. home from school one day. Defendant called F.M. into his room, undressed her, and placed his penis in her vagina. On another occasion while they were living in Indiana, defendant placed his mouth on F.M.'s chest.

¶ 9    F.M. testified that the last time she saw defendant was the day he was arrested, August 16, 2012. The family was living in Aurora at the time. On August 16, after F.M.'s mother went to work, defendant called for her from his bedroom. When she went to the bedroom, defendant undressed her and placed her on the bed on her stomach. He then placed his penis, fingers, and tongue in her vagina, his penis in her mouth and anus, his tongue in her anus, and his mouth on her breasts. When he was done, F.M. used the bathroom. F.M. identified People's Exhibit 5 as underwear she put on after using the bathroom.

¶ 10    F.M. testified that, from mid-July to the end of July 2012, while the family was living in Aurora, defendant would undress her and place her on the bed on her back. He would put his penis, fingers, and tongue in her vagina. He would also have her get on her hands and knees and then would put his penis in her mouth.

¶ 11    At this point in F.M.'s testimony, the prosecutor noted that F.M. had described "two instances" that occurred while the family lived in Aurora. he prosecutor asked how many other times "[this] occurred" while the family lived in Aurora. F.M. responded that defendant put his penis in her anus four other times, put his mouth on F.M.'s breasts four or five other times, and put his tongue in her vagina about six other times.

¶ 12    Between August 10 and 14, 2012, F.M., her sister, her mother, and defendant stayed in a motel in Naperville while their apartment was being fumigated. On either August 11 or 12, after F.M.'s mother had left for work, F.M. was sleeping. She awoke to find defendant on top of L.M. L.M.'s legs were spread open, and she was dressed only in a shirt. Defendant was naked. F.M. grabbed L.M. and L.M.'s pants. She took L.M. to the bathroom and gave her a shower. While at the motel, defendant also touched F.M.'s vagina with his penis.

¶ 13  On cross-examination, F.M. acknowledged that, in February and March of 2013, she executed affidavits indicating that she had made false accusations against defendant. On redirect examination, F.M. testified that she signed the first affidavit at her mother's request and did not read it before signing. F.M. testified that the affidavits were untrue.

¶ 14  L.M. testified that she was born on June 4, 2002, and was 12 years old at the time of her testimony. While she and her family lived in Aurora, defendant put her legs up on his shoulders and started licking her "private spot." A few days later, defendant had L.M. kneel on the floor. He pulled down her clothing and started licking her "back private spot," or her "[b]utt." L.M. was about eight years old on both occasions. On one occasion when L.M. was nine years old and still living in Indiana, defendant touched her private spot with his penis.

¶ 15  In 2012, while L.M. and her family were staying in a motel in Du Page County, defendant told L.M. to get in his bed and to open her legs. L.M. testified that defendant "pulled down what [she] was wearing and pulled down what he was wearing." Then defendant "sticked [*sic*] his private in [her] private part."

¶ 16  L.M. testified that, in February 2013, she signed two affidavits. She did not read them before signing. She signed the affidavits because she had seen her sister sign one. L.M. indicated that the affidavits were not true.

¶ 17  Forensic examination of People's Exhibit 5 (the underwear F.M. put on after defendant assaulted her on August 16, 2012) revealed the presence of semen. A "Y-STR" analysis of the DNA found in the semen revealed a haplotype matching a sample of defendant's DNA. (We note that a Y-STR haplotype is not unique to a given individual; all males descended from a common male ancestor will have the same haplotype. See *People v. Zapata*, 2014 IL App (2d) 120825, ¶ 6.) An expert witness in forensic biology and DNA analysis testified that Y-STR analysis of a DNA

sample from defendant's brother Carlos (who had resided in Aurora with the family) revealed the same haplotype. The same expert acknowledged that peer-reviewed literature indicated that laundering clothing could transfer sperm from one item of clothing to another.

¶ 18   Evidence of conversations between a law enforcement officer and defendant's wife were admitted into evidence. During the conversations, defendant's wife indicated that defendant orchestrated the preparation of the affidavits that F.M. and L.M. executed.

¶ 19   Defendant testified that, after his arrest, he was interviewed by two police officers. He denied the accusations against him. After defendant was transported to the county jail, he was visited by two "social workers," who told him that his family was in custody and were "suffering a lot and *** did not want to be alone." The social workers "told [him] that[,] if [he] wanted to say some things[,] they wanted to tape it and that, in two hours, they would get [him] out and they would take [him] to [his] family." Defendant made the recorded statement because he wanted to see his family. The social workers told him to admit the accusations of sexual conduct with F.M. During his testimony, however, defendant denied that, while living in Indiana, he touched F.M. in a sexual or otherwise inappropriate manner while her mother was traveling. He also denied touching L.M. in a sexual or otherwise inappropriate manner while they were living in Indiana. He similarly denied any sexual or inappropriate contact with F.M. or L.M. in Aurora or at the motel in Du Page County.

¶ 20   As noted, defendant was convicted of 20 counts of criminal sexual assault and one count of aggravated criminal sexual abuse. Defendant appealed, arguing that the trial court erred in (1) admitting evidence of conversations between his wife and a law enforcement officer and (2) ordering him to pay restitution without specifying a payment plan or considering his ability to pay. *People v. Mendoza-Sosa*, 2017 IL App (2d) 150072-U, ¶ 20, 33. We affirmed. *Id.* ¶ 40. In

2018, defendant filed a petition for relief under the Act. The trial court appointed counsel, who amended the petition. The amended petition claimed, *inter alia*, that defendant received ineffective assistance of counsel on appeal because appellate counsel failed to argue that the trial court erred in admitting evidence of uncharged sex offenses. The State moved to dismiss the amended petition. The trial court granted the motion, and this appeal followed.

¶ 21                                    II. ANALYSIS

¶ 22    The Act provides a mechanism by which a criminal defendant may obtain relief from a conviction resulting from a substantial violation of the defendant's constitutional rights. *People v. Ross*, 2022 IL App (2d) 210068, ¶ 15. As our supreme court has explained:

> "Under the Act, a postconviction proceeding contains three stages. At the first stage, the [trial] court must independently review the postconviction petition, without input from the State, and determine whether it is 'frivolous or is patently without merit.' [Citation.] If the court makes this determination, the court must dismiss the petition in a written order. [Citation.] If the petition is not dismissed, the proceedings move to the second stage. [Citation.]
>
> At the second stage, counsel is appointed to represent the defendant, if he is indigent [citation], and the State is permitted to file responsive pleadings [citation]. The [trial] court must determine at this stage whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. [Citation.] If no such showing is made, the petition is dismissed. If, however, the petition sets forth a substantial showing of a constitutional violation, it is advanced to the third stage, where the [trial] court conducts an evidentiary hearing [citation]." *People v. Johnson*, 2018 IL 122227, ¶¶ 14-15.

¶ 23    At issue is whether defendant made a substantial showing that appellate counsel provided ineffective assistance. Ineffective-assistance-of-counsel claims are evaluated under the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984), which requires a showing that counsel's performance "fell below an objective standard of reasonableness" and that the deficient performance was prejudicial in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." This standard applies to both trial and appellate counsel. *People v. Randall*, 2021 IL App (1st) 191194, ¶ 66. "If a defendant claims that appellate counsel was ineffective for failing to raise a claim of trial error, a defendant must show not only that appellate counsel's performance was deficient but also that there is a reasonable probability that the underlying claim of trial error would have succeeded on direct appeal." *Id.* Defendant contends that he made a substantial showing that appellate counsel was ineffective for failing to argue that the trial court erred in permitting the State to admit evidence of other sex offenses.

¶ 24    As we have observed, "[e]vidence regarding a defendant's other crimes is normally inadmissible if offered to demonstrate the defendant's bad character or his propensity to commit crime." *People v. Walston*, 386 Ill. App. 3d 598, 609-10 (2008). However, section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2012)) carves out an exception for prosecutions of certain offenses, including sex offenses against children. Section 115-7.3. provides, in pertinent part:

        (a) This Section applies to criminal cases in which:

                (1) the defendant is accused of predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse, criminal sexual abuse, child pornography, aggravated child pornography, criminal transmission of HIV, or child abduction as defined in

paragraph (10) of subsection (b) of Section 10-5 of the Criminal Code of 1961 or the Criminal Code of 2012;

\* \* \*

(b) If the defendant is accused of an offense set forth in paragraph (1)(a), \*\*\* evidence of the defendant's commission of another offense or offenses set forth in paragraph (1) \*\*\* of subsection (a) \*\*\* may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant.

(c) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances."

¶ 25 As we observed in *People v. Adams,* 2023 IL App (2d) 220061, ¶ 68:

"In enacting section 115-7.3, the legislature 'intended to single out sex offenders \*\*\* in recognition of the propensity of sex offenders to repeat their crimes.' [Citation.] Although other-crimes evidence is unquestionably prejudicial to a defendant [citation], the danger of undue prejudice in a section 115-7.3 case is 'less pronounced' than in other common-law other-crimes cases [citation]. That danger is lessened because the legislature's enactment of section 115-7.3 cut against the general rule that other-crimes evidence is *per se* unduly prejudicial by making the use of other-crimes evidence proper to show a defendant's propensity. [Citation.]"

Whether to admit evidence of uncharged sex offenses under section 115-7.3 rests in the sound discretion of the trial court. *Id.* ¶ 62. "Under the abuse-of-discretion standard, reversal is not required where reasonable minds can disagree over the decision to admit other-crimes evidence." *Id.*

¶ 26    We cannot say that the trial court's decision to admit evidence of certain uncharged sex offenses was an abuse of discretion. The uncharged offenses were reasonably proximate in time to the charged offenses. The charged offenses occurred between June and August 2012. The uncharged offenses in Indiana occurred, at most, between two and four years before the charged offenses. In *People v. Donoho*, 204 Ill. 2d 159, 186 (2003), the court found no abuse of discretion in admitting evidence of an offense that occurred 12 to 15 years before the charged offenses where there were substantial similarities among the offenses. The same is true here. The charged and uncharged offenses involved similar sex acts committed by defendant against his daughters.

¶ 27    However, defendant complains that the *amount* of evidence of uncharged crimes was unduly prejudicial. In support of his argument, he cites *People v. Cardamone*, 381 Ill. App. 3d 462 (2008). In *Cardamone,* the defendant, a gymnastics coach, was charged with a total of 26 sex offenses against 14 gymnasts. *Id.* at 464. He was convicted of nine counts of aggravated criminal sexual abuse against 7 of the 14 complaining witnesses. *Id.* at 488. However, those seven witnesses testified that the defendant committed between 158 and 257 uncharged acts. *Id.* at 491. The court did not tally the uncharged offenses about which the remaining seven complaining witnesses testified. A fifteenth witness testified solely about an incident of sexual conduct for which the State brought no charges. *Id.* at 481-82. We concluded that the trial court abused its discretion in allowing evidence of so many uncharged offenses. *Id.* at 497. We observed that "the volume of

the other-crimes evidence was overwhelming and undoubtedly more prejudicial than probative."
*Id.*

¶ 28    There is no meaningful comparison between *Cardamone* and this case. Here, the jury heard evidence of, at most, six uncharged sex offenses: two against F.M. in Indiana, one against F.M. in Du Page County, two against L.M. in Indiana, and one against L.M. in Du Page County. Moreover, there was little possibility for confusion here. The trial court read a limiting instruction for each portion of testimony concerning uncharged offenses.

¶ 29    Defendant argues that "the very nature of the charges, as well as the sheer number of charges, already created a certain level of prejudice against [defendant], as was evidenced by the responses of potential jurors during *voir dire*." In particular, defendant notes the reactions of two prospective jurors who were excused for cause, but also generally alludes to "potential jurors echo[ing] similar concerns about being impartial in light of the type and number of charges in this case." It is doubtful whether a review of *voir dire* is a valid basis for assessing the prejudice from evidence of uncharged sex offenses. In any event, defendant's argument exaggerates the extent to which such concerns are present here. It is true that several members of the *venire* who were ultimately selected as jurors indicated that they found the charges against defendant disturbing, but only one of them expressed any doubt about his ability to remain impartial. Significantly, his concerns were related only to testimony from witnesses 12 or younger. F.M. was not in that category at the time of trial. Although L.M. was only 12 when she testified, defendant was not charged with any offenses against her. We decline to speculate whether L.M.'s testimony impaired the ability of the single juror in question to remain impartial when deliberating on the charged offenses allegedly committed against L.M.'s older sister.

¶ 30    Defendant further notes the jury's request for a copy of the indictment and its request for clarification of the offense of aggravated criminal sexual abuse and the number of times defendant was charged with it. According to defendant, those requests suggest that the jurors "struggled to separate the charged from the uncharged acts in this case, and were left unsure which acts *** and how many acts *** they were meant to be deciding." We disagree. Given the number of charges against defendant, we can easily see how questions about the charges could have arisen regardless of the evidence of uncharged conduct.

¶ 31    We conclude that there was no reasonable probability that an appellate challenge to the trial court's decision to admit evidence of uncharged sex offenses would have succeeded. Therefore, because appellate counsel's failure to raise such a challenge did not result in prejudice to defendant within the meaning of *Strickland*, defendant's amended postconviction petition did not make a substantial showing of a deprivation of the right to the effective assistance of counsel. Accordingly, the amended petition was properly dismissed.

¶ 32                                    III. CONCLUSION

¶ 33    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 34    Affirmed.